IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


LINDA J. ROLAND,

    Plaintiff,

vs.                                  Case No.  4:07cv296-WS/WCS

MICHAEL J. ASTRUE,
**Commissioner of Social Security,**

    Defendant.

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).  It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Linda J. Roland, applied for disability insurance benefits and supplemental security income benefits.  Plaintiff was 58 years old at the time of the administrative hearing, has a 9th grade education with vocational education in child care, and has past relevant work as a nursery school attendant, retail store supervisor,

retail manager, sales clerk, file clerk, and cashier.  Plaintiff alleges disability due to arthritis, hypertension, gastroesophageal reflux disease (GERD), depression, dementia, headaches, a history of transient ischemic attacks, and seizure disorder.

The Administrative Law Judge found that Plaintiff was disabled on and after January 12, 2004, but not prior to that date.   He found that Plaintiff had the residual functional capacity to do medium work, with limitations, prior to that date and therefore was not yet disabled.  Since he found that Plaintiff's last insured date for disability insurance benefits was June 30, 2001, this resulted in a denial of the application for disability insurance benefits but the granting of the application for supplemental security income benefits with onset date of January 12, 2004.  R. 23.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1. Is the individual currently engaged in substantial gainful activity?
2. Does the individual have any severe impairments?

    3.     Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

    4.     Does the individual have any impairments which prevent past relevant work?

    5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Legal Analysis**[1]

    **Whether the ALJ correctly determined that Plaintiff's insured status for disability insurance benefits expired on June 30, 2001**

A claimant must show onset of disability prior to expiration of the claimant's insured status to be eligible for disability insurance benefits. 42 U.S.C. § 423(a) and (c); Ware v. Schweiker, 651 F.2d 408, 411 (5th Cir. 1981), *cert. denied*, 444 U.S. 952 (1979); Milam v. Bowen, 782 F.2d 1284, 1286 (11th Cir. 1986). Plaintiff contends that

---

[1] The issues presented by Plaintiff have been reordered in this report and recommendation.

the ALJ relied on an incorrect earnings record to determine that her disability insurance status expired on June 30, 2001.

The Administrative Law Judge relied upon the Commissioner's record of Plaintiff's earnings, which show that she earned only $391.66 in 2001 and $14,213.00 in 2002. R. 62. This resulted in a last insured date of June, 2001. R. 57. Plaintiff argues that the date of expiration of insured status should have been March 31, 2003. Doc. 11, p. 13.

If the Administrative Law Judge's determination as to the expiration date of Plaintiff's insured status is supported by substantial evidence in the record, this court must affirm. Desselle v. Barnhart, 415 F.3d 861, 864 (8th Cir. 2005). Insured status for disability benefits is determined by whether an individual had the required number of "quarters" of earnings preceding the months for which the benefit is sought. 42 U.S.C. § 423(c)(1). The Commissioner must rely upon its own records to make this determination. 42 U.S.C. § 405(c)(2)(A). The time limit for seeking a correction of an earnings record is 3 years, 3 months, and 15 days after the year in which the earnings were received. 20 C.F.R. §§ 404.802 and 404.821. The administrative hearing was held on July 17, 2006, R. 407, beyond the time limit for correcting wages from either 2001 or 2002. After the time limit for correcting an earnings record ends, the record may be corrected if there was "fraud" or if the taxpayer files a tax return with the correction "to the extent that the amount of earnings shown in the return is correct." 20 C.F.R. § 404.822(b) and (e)(3). There are other exceptions not applicable in this case.

Plaintiff presented new evidence of earnings for 2001 and 2002 at the hearing. The new evidence were two IRS forms 1099-MISC stating that Plaintiff was paid $4,800

in 2001 and in 2002.  R. 349, 410.  The payer was Mark A. Singletary.  *Id*.  Plaintiff said that Mr. Singletary was a long-time friend, and she had done filing work for him.  R. 422-423.  He had a trucking company.  R. 423.  She said she worked about an hour per week, but it was work in her home and she did not really know how long she worked each day.  *Id*. and R. 437.

Mr. Singletary testified that he considered himself to be in a "common law" marriage with Plaintiff.  R. 438.  He said that the amounts reported on the forms were what he submitted to the Internal Revenue Service.  *Id*.  He said that he calculated the $4,800 figure as the amount that he gave to Plaintiff to help her pay her bills, and he thought of it as a gift because Plaintiff "wasn't really working."  R. 439.  He said:

> More like something for her to do and, you know, pretty much a gift, I guess you can call it a gift.  She did some filing stuff for me, but, you know, trying to keep her mind occupied, you know.

*Id*.  Mr. Singletary said that the $14, 213 reported as Plaintiff's earnings in 2002 was a mistake made by his certified public account.  R. 440.  He said:  "I don't know how she got $14,000 on it.  I haven't seen the records."  *Id*.  He said that this deduction from the income tax calculation for his trucking company was "falsified" and he was still in the process of trying to correct this with the IRS.  *Id*.

In summary, substantial evidence exists in the record for the refusal of the ALJ to change the disability insurance expiration date.  A form 1099-MISC is not an income tax return.  Further, the evidence above did not reliably show that Plaintiff's earnings in 2001 and 2002 should have been corrected.  Hence, it was not error to fail to adopt the insured status expiration date suggested by Plaintiff.

**Whether the ALJ correctly determined that Plaintiff's alleged onset of disability date was March 31, 2003**

Plaintiff alleged an onset date of October 31, 2000.  R. 48.  This is an *allegation* and entirely within the control of Plaintiff.[2]  It was incorrect for the ALJ to find that the *alleged* onset date was March 31, 2003.  R. 18.  This finding, however, does not affect the outcome.

**Whether the weight of the evidence supports the ALJ's finding that Plaintiff had the residual functional capacity to do medium work prior to January 12, 2004**

The Administrative Law Judge determined that prior to January 12, 2004, Plaintiff could do medium work.[3]  R. 20.  He found that she could stand or walk for 6 hours in an 8 hour day, but could never climb ladders and had to avoid heights and moving machinery.  *Id.*  Plaintiff contends that this finding is not supported by substantial evidence in the record.  Plaintiff contends that the record shows that prior to that date Plaintiff suffered from the same impairments that caused a finding of disability after that date, that is, arthritis, hypertension, depression, dementia, headaches, and GERD.

Plaintiff cites the following evidence for this argument.  On April 26, 2001, Plaintiff was seen by Vijay Desai, M.D., complaining of back and hip pain radiating down her leg and buttock area near the sciatic area.  R. 394.  Her blood pressure was high, 170 over 100.  *Id.*  The straight leg raising test was negative for pain, and there was no

---

[2] This is to be distinguished from an adjudication of an onset date in fact, which requires proof.  The onset date ultimately proven was January 12, 2004.

[3] 20 C.F.R. § 404.1567(c) provides:  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 416.967(c) is identical.

weakness, but her back was tender in the lumbar spine region.  *Id.*  Dr. Desai prescribed Mobic[4] for back pain.  *Id.*

On January 7, 2002, Plaintiff returned to Dr. Desai with a complaint of chronic headaches.  R. 401.  She said she continued to have pain in her lower back.  *Id.*  Dr. Desai noted that her GERD and hypertension were controlled.  *Id.*  Tylenol was prescribed and she was to have her eyes re-tested.  *Id.*  Depression was also noted, and Paxil[5] was prescribed.  *Id.*

On August 29, 2002, Plaintiff was seen again by Dr. Desai.  R. 383.  Paxil was helping her depression, but she still was depressed.  *Id.*  Her blood pressure and GERD were stable and controlled.  *Id.*  She said she had had pain for the prior week on the left side of her neck, radiating to her chest and arm.  *Id.*  She said she had been forgetful, forgetting words, names, and where she put things.  *Id.*  Her arthritis (noted as O/A, osteoarthritis) had been bad for six months and was getting worse.  *Id.*

On September 26, 2002, Plaintiff again complained of forgetfulness for words.  R. 382.  Dr. Desai noted that Plaintiff's forgetfulness might be a symptom of onset of Alzheimers Dementia.  R. 382.

On November 25, 2002, Plaintiff was seen at Neighborhood Health Services, Inc. R. 235.  She said that her arthritis had been flaring up and she had headaches.  *Id.*  She

---

[4] Mobic is a nonsteroidal anti-inflammatory drug (NSAID) in prescription form. It is used to relieve the pain and stiffness of osteoarthritis and rheumatoid arthritis. PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx.

[5] Paxil relieves a variety of emotional problems.  It can be prescribed for serious, continuing depression that interferes with a person's ability to function.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

said that she felt "spacey," though she drove to the clinic. *Id.* She said she would forget tasks that she was doing, that she burned things when cooking, water would overflow when she was doing dishes, and she had problems calculating, spelling, and finding words. *Id.* She carried a "book" to help her remember things. *Id.* She was diagnosed as having dementia, rule out "reversible." *Id.* On November 27, 2002, a neurologist recommended an MRI. R. 234.

On February 20, 2003, T. Wayne Conger, Ph.D., reviewed Plaintiff's medical records without conducting his own examination. R. 130-132. Dr. Conger determined that: "Although the claimant's cognitive deficits may result in some memory [or] concentration problems, she is mentally capable of performing simple, routine tasks on a sustained basis (longer than 2 hours)." R. 132. On the same date, Dr. Conger noted that Plaintiff had an organic mental disorder, an affective disorder, and adjustment disorder with mixed. R. 134, 137. He found that Plaintiff had memory impairment and a cognitive disorder, not otherwise specified. R. 135. He found moderate limitation in activities of daily living and in maintaining concentration, persistence, and pace, and mild limitations in maintaining social functioning. R. 144. Dr. Conger concluded:

> The claimant is limited by her physical condition and pain to some extent and she also shows some cognitive deficits. However, formal testing indicates memory and concentration/attention skills consistent with her low average intellectual abilities. The claimant also acknowledges the mental ability to perform some routine tasks attempt[ed. T]he granddaughter has confirm[ed] some cognitive deficits. The claimant has been diagnosed [with] Dementia of the Alzheimer's Type but there is no current evidence to confirm that diagnosis or formal testing. She can relate in a socially appropriate manner and there is no indication of a mental impairment that would meet or equal any listing.

R. 146.[6]

On March 6, 2003, Kirk J. Mauro, M.D., examined Plaintiff on a consultative basis. R. 148. Plaintiff reported increasing low back pain. *Id*. She said she quit work as the manager of a convenience store in 2000. *Id*. She said that she lives alone, and is independent with feeding, grooming, dressing, bathing, cooking, cleaning, and doing laundry. R. 148. She said she was able to carry grocery bags and a laundry basket. *Id*. She could walk short distances, and could sit for an hour or two before becoming stiff. *Id*. She could handle buttons, zippers, snaps, and hooks, when dressing. *Id*. On examination, Dr. Mauro found:

> She has increased lumbar lordosis,[7] due to her abdominal girth. There is no paraspinal spasm. There is no step-off. There is no SI joint tenderness. The cranial nerve and cerebellar testing are within normal limits. There is no facial asymmetry. *She is awake, alert and able to follow one, two and three step commands. She has good memory, both short- and long-term. She knows the current month, date, president and current events. There is no evidence to suggest Alzheimer's disease.* The motor examination is 4/5 in the upper and lower extremities and symmetrical. There is no visible or measurable atrophy. The sensory examination is normal. There is no peripheral nerve or dermatomal deficit. The reflexes were 2 to 3/4 in the upper and lower extremities, and symmetrical. She has negative straight leg raise at 90 degrees. She was able to stand on her heels and toes. She was able to squat. She has intact finger dexterity. The joints have no pain, swelling, redness or signs of abnormality or inflammation. At the time of the evaluation she is awake, alert with no neurotic or psychotic behaviors noted.

R. 149 (emphasis added). Dr. Mauro concluded that this was a normal physical examination. *Id*.

---

[6] The third and fourth sentences have portions that are very difficult to decipher.

[7] Lordosis the anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side, also called also hollow back, saddle back, and swayback. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

On March 18, 2003, L. Batts, SDM, reviewed the medical records and assigned a residual functional capacity to Plaintiff similar to that found by the Administrative Law Judge. R. 156-163.

On October 23, 2003, Plaintiff returned to Neighborhood Health Services after having been in the hospital for seven days with seizures. R. 223. She had been placed on Dilantin.[8] She was told not to drive any more. *Id.* She had suffered trembling hands, jerks, and numbness during these seizures. *Id.* The record states: "As part of Alzheimer, noted crying, anger, frustration, can't sleep." *Id.* She was diagnosed with Alzheimer's disease, with behavior problems and insomnia. *Id.* Risperdal[9] and Dilantin were prescribed. *Id.*

> An MRI scan of Plaintiff's brain on September 26, 2003, showed: multiple scattered foci of T2 signal within the subcortical white matter of both frontal lobes. The differential diagnosis includes changes of vasculitis, migraine headaches, or small vessel ischemic disease. . . .

R. 269.

Plaintiff had a comprehensive psychological evaluation on January 12, 2004, by Gerald J. Hodan, Ph.D. R. 151-155. This was the date that the Administrative Law Judge determined that Plaintiff became disabled for purposes of supplemental security income benefits. Plaintiff said she had been having problems for two years with

---

[8] Dilantin is an antiepileptic drug, prescribed to control grand mal seizures (a type of seizure in which the individual experiences a sudden loss of consciousness immediately followed by generalized convulsions) and temporal lobe seizures (a type of seizure caused by disease in the cortex of the temporal [side] lobe of the brain affecting smell, taste, sight, hearing, memory, and movement). Dilantin may also be used to prevent and treat seizures occurring during and after neurosurgery (surgery of the brain and spinal cord). PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[9] Risperdal is used to treat schizophrenia. PHYSICIANS' DESK REFERENCE (2005).

dementia, seizures, TIAs (transient ischemic attacks), numbness, and slurred speech.

R. 151.  Reviewing the prior history and evaluations, it was noted that:

> Assessment of memory result in a diagnosis of dementia of the Alzheimer's by history and her own report although the test results from memory testing were basically within the borderline range rather than the range considered significant for a diagnosis of dementia.  In fact her General Memory, or short-term memory, Index was 86, which was quite consistent with her intellectual functioning.

*Id.*  He noted the abnormal EEG in September, 2003, "suggestive of an underlying structural lesion, which is potentially irritable in nature."  R. 152.  New tests were administered, and Plaintiff's memory scores were about the same as the last set of tests.  R. 153.  Dr. Holden concluded that Plaintiff "is perhaps limited to following simple, briefly stated instructions and doing simple, repetitive and routine tasks."  R. 154.  She had poor tolerance for stress, would become easily irritated, and that could create some problems in sustaining relationships with others in a work setting.  R. 155.  His diagnosis was personality changes due to a prior history of mini-stokes and seizure disorder, and adjustment disorder, with depressed mood.  *Id.*  On Axis V he assigned a current GAF of 50.[10]

---

[10] The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.' *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)." Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

> GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Manual at 34.  GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

On March 20, 2004, Eric D. Martin, Ph.D., reviewed Plaintiff's records.  R. 164-177.  He thought that Plaintiff would have moderate difficulties in maintaining social functioning, concentration, persistence, or pace.  R. 174.  He found that neuropsychological evaluations on January 3 and 4 (presumably in 2004) had not substantiated the presence of dementia.  R. 176.  He thought that Plaintiff was "capable of adequate ADL [activities of daily living] performance within her physical parameters, but reports difficulty with memory [or] concentration.  Reported limitations appear to exceed objective findings."  Id.  He found a few moderate limitations, but no marked limitations.  R. 178-179.

On December 29, 2004, Plaintiff was admitted to Morton Plant Hospital for complaints of numbness of her feet, slurred speech, blurry vision, and tightness in the chest.  R. 292.  The diagnosis was a transient ischemic attack and chest pain, rule out unstable angina.  R. 294.  The next day, Plaintiff was seen by Barry L. Leber, M.D.  R. 289-291.  After an examination and review of the records, Dr. Leber said he did not think Plaintiff's symptoms were "compatible with a transient ischemic attack or stroke," and had nothing further to recommend to evaluate her symptoms.  R. 290.  He did not believe that Plaintiff had Alzheimer's disease, though she might have memory problems.  R. 291.  He noted episodes of rage and depression.  Id.  He was also skeptical that Plaintiff had had seizures, though she was currently taking Dilantin.  Id.  He recommended that Dilantin be discontinued unless the EEG "shows definite epileptiform

---

Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  Axis V of the DSM-IV Multiaxial System is explained at:
http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

activity." *Id.* An EEG was performed on the same day and no epileptiform activity was noted. R. 312. The EEG did show an abnormality, described as "generalized high-voltage disorganization and slowing." *Id.*

Plaintiff was seen by Meenakshi Garg, M.D., on March 14, 2005. R. 315. Dr. Garg noted the evaluations discussed above, that Plaintiff's memory loss and abnormal EEG were not likely attributable to Alzheimer's disease or seizures. *Id.* Dr. Garg's diagnosis was "dementia-pseudodementia vs secondary to small vessel ischemic changes." *Id.* Joining a support group, obtaining an identification badge, and using transportation services as needed was recommended. *Id.*

Considering all of this evidence, the decision of the Administrative Law Judge to find no disability prior to January 12, 2004, is supported by substantial evidence. Despite the seizures suffered in October, 2003, the evidence even after January, 2004, was equivocal. On March 24, 2004, Dr. Martin, Ph.D., found that neuropsychological evaluations had not substantiated the presence of dementia. On December 29, 2004, Dr. Leber said he did not think Plaintiff's symptoms were "compatible with a transient ischemic attack or stroke." He did not believe that Plaintiff had Alzheimer's disease and the EEG did not show epileptiform activity to justify the need to continue Dilantin.

The medical record before January 12, 2004, likewise contains substantial evidence to support the ALJ's conclusion of no disability prior to that date. There is not much evidence of any significant impairment due to back pain. While the medical record has several notations of forgetfulness in 2002, there was no formal testing confirming a significant mental impairment. On February 20, 2003, Dr. Conger said from a review of the records that there was no evidence of dementia or Alzheimer's

disease; he thought that Plaintiff could relate in a socially appropriate manner and was mentally capable of performing simple, routine tasks on a sustained basis, longer than 2 hours. On March 6, 2003, Dr. Mauro found upon examination that Plaintiff had good memory, and there was no evidence to suggest Alzheimer's disease or physical impairment. All physical tests were negative for impairment. Plaintiff related to Dr. Mauro an ability to perform substantial activities of daily living. He said that Plaintiff had good short and long term memory, and there was no evidence of Alzheimer's disease. The evidence from the hospitalization in October, 2003, begins to suggest a deterioration of Plaintiff's condition, but this is consistent with the ALJ's determination of disability beginning in January, 2004.

### Whether the ALJ should have found Plaintiff disabled using Grid Rule 201.02

Grid Rule 201.02 provides that a person who is advanced age (age 55 and older), with limited or less education, and no transferable skills, is disabled if able to do sedentary work only. Plaintiff had no transferrable skills. R. 446. The issue is whether the ALJ's determination that Plaintiff has more than the residual functional capacity to do sedentary work prior to January 12, 2004, is supported by substantial evidence in the record. It is, for the reasons discussed above.

**Whether the ALJ was required to obtain medical expert opinion as to the onset date**

Plaintiff contends that the ALJ was required to obtain a consultation with a medical expert to determine her onset date of disability. Doc. 11, p. 14. She contends that this is required where the disability is progressive, without a sudden traumatic origin. *Id.* Cited for this is Social Security Ruling 83-20[11] and a number of cases. *Id.* In the first case cited, McManus v. Barnhart, 2004 WL 3316303 (M.D. Fla. Dec. 14, 2004), the court reviewed a number of cases and concluded:

> Because the issue of onset is inextricably tied to the determination of disability in cases where the impairment is a slowly progressive condition that is not traumatic in origin, the Court concludes that the most logical interpretation of SSR 83-20 is to apply it to situations where the ALJ is called upon to make a retroactive inference regarding disability involving a slowly progressive impairment, *and the medical evidence during the insured period is inadequate or ambiguous.* Accordingly, in those situations the ALJ should be required to obtain the advice of a medical advisor to assist the ALJ in making the determination from the available medical evidence of whether the slowly progressive impairment constituted a disability prior to the date last insured.

2004 WL 3316303, *6. "[T]he ALJ is required to secure the assistance of a medical advisor where the medical evidence of record is ambiguous or inadequate." *Id.*, at *7.

This is a reasonable interpretation of SSR 83-20. That Ruling provides that if precise evidence is not available, and inference as to the onset date is needed, the services of a medical expert may be needed. The Ruling states:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disability impairment(s) [sic] occurred some time *prior to the date of the first recorded medical examination*, e.g., the date the claimant stopped working. How long the disease may be

---

[11] Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.

> determined to have existed at a disabling level of severity depends on an *informed judgment of the facts of the particular case*. This judgment, however, *must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when the onset must be inferred*. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before the inferences are made.

SSR 83-20 (emphasis added).

Whether, as argued by Defendant, SSR 83-20 applies only for inferences of an onset prior to the first recorded medical examination need not be decided here because even if this is not so, there was no need for an expert opinion in this case. The ALJ's "judgment" had "a legitimate medical basis." Plaintiff's last insured status for disability insurance benefits was June 30, 2001. From the discussion above, it was not error for the ALJ to determine that Plaintiff's disability commenced on January 12, 2004. There was medical evidence from the years 2002 and 2003, but that evidence was not enough to show disability commencing before January 12, 2004. That being the case, it was not unreasonable for the ALJ to implicitly find that it was clear, and not ambiguous, that Plaintiff was not disabled on or before her last insured date, June 30, 2001. Hence, there was no need for a retrospective opinion from a medical expert to determine onset of disability to adjudicate the disability insurance benefits claim.

Likewise, for the reasons discussed above, the selection of January 12, 2004, for the commencement of supplemental security income disability, but not before, has the support of substantial evidence in the record. There was no ambiguity that disability had not commenced before that date. Thus, an expert was not needed.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and are based upon substantial evidence in the record. The decision of the Commissioner should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on February 4, 2008.


        s/    William C. Sherrill, Jr.
        **WILLIAM C. SHERRILL, JR.**
        **UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**